## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 21-MC-22310-ALTONAGA/Louis

EUCLID FISH COMPANY

     Plaintiff,

v.

CAPE FLORIDA SEAFOOD; *et al*.,

     Defendants.

_____/

### REPORT AND RECOMMENDATION ON MOTION TO QUASH

**THIS CAUSE** is before the Court on non-party Norwegian Seafood Council's Motion to Quash Subpoena, ECF No. 1, served upon it in connection with the litigation in *In re Farm-Raised Salmon And Salmon Products Antitrust Litigation*, No. 19-21551-CIV-ALTONAGA/Louis (hereinafter "*Farm-Raised Salmon*").  NSC filed a Memorandum of Law in Support of its Motion, ECF No. 2, to which the *Farm-Raised Salmon* Plaintiffs filed a Response in Opposition, ECF No. 11, and the Council further filed a Reply, ECF No. 24.  This matter was referred to the undersigned United States Magistrate Judge by the Honorable Cecilia M. Altonaga, Chief Judge for the Southern District of Florida for a Report and Recommendation on the Motion to Quash.  ECF No. 22.  A hearing was held on July 23, 2021.  Upon consideration of the Motion and Memorandum in Support, the Response, Reply, and being otherwise duly apprised in the matter, I hereby **RECOMMEND** that the Motion to Quash be **GRANTED**.

### I.  BACKGROUND

The underlying litigation in *Farm-Raised Salmon* arises from a class action brought on behalf of direct purchasers of farm-raised Atlantic salmon and salmon products, who assert claims against Defendants for violations of sections 1 and 3 of the Sherman Act.  *See* 15 U.S.C. §§ 1, 3.

Plaintiffs allege that Defendants engaged in the unlawful coordination of prices charged to direct purchasers of salmon from April 10, 2013 through the present.  These allegations underlie investigations being conducted by the European Union's European Commission and the United States Department of Justice, both of which are investigating illegal anticompetitive behavior in the farmed salmon market.

Norway, whose second-largest export is seafood, created what was then known as the Export Council for Fish[1] in 1991 under the Norwegian Act of Export of Fish, Act No. 9 of 27 April 1990 and Regulation No. 157 of 22 March 1991.  ECF No. 3 (Declaration of Anne-Kristine Øen, USA Norwegian Seafood Council Director).  While originally a government agency under the umbrella of the Norwegian Ministry of Trade, Industry and Fisheries (the "Ministry"), in 2005 the Export Council for Fish was incorporated as a limited liability company under the Norwegian Limited Liability Act.  *Id.*  In 2012, the Export Council was renamed the Norwegian Seafood Council ("NSC").[2]  Since its incorporation, NSC has been entirely owned by the Norwegian government, whose ownership interest in NSC is vested with the Ministry; the government appoints all directors on NSC's Board of Directors, except three directors elected by NSC's employees, and the Ministry maintains managerial responsibility over NSC.  *Id.*

NSC is funded exclusively through a duty tax imposed on individual exporters, the amount of which is the combined sum of an annual fee and a market fee derived from the export value of fish and fisheries products originating in Norway, as per the Norwegian Customs Tariffs.  *Id.*  As prescribed by Norwegian law, NSC is charged with the duty to register would-be exporters interested in exporting fish and fishery products out of Norway, positioning NSC as the approval authority for all seafood exporters.  *Id.*  Norwegian law also tasks NSC with enhancing the demand

---

[1] As translated; in Norwegian, its title was "Eksportutvalget for Fisk."
[2] Known as "Norges sjømatråd AS" in Norwegian.

for Norwegian seafood and facilitating "enhanced exportation" of Norway's seafood; as articulated in NSC's bylaws, while the NSC has no profit-generating goal of its own, its purpose is to "increase value creation in the Norwegian fisheries and aquaculture industry through increased demand and knowledge of Norwegian seafood at home and abroad." *Id.* To that end, NSC promotes Norwegian seafood on a "generic" basis, produces aggregated historical reports regarding seafood products; "facilitat[es] access" to Norwegian seafood and safeguards its reputation. *Id.* NSC's bylaws prohibit the provision of support or conferring other benefits that could potentially be viewed as distorting competition and thus illegal under certain international agreements. *Id.* (noting that NSC is subject to review by the Norwegian State Office of the Auditor General, which monitors NSC complies with the both the law and its mandated tasks).

NSC is headquartered in Norway and has a single office in the United States located in Boston, Massachusetts, in which only one of NSC's 72 employees works. ECF No. 2 at 7. That employee, Øen, is technically employed in Norway and is registered as a Member of the Administrative and Technical Staff at the Royal Norwegian Consulate General in New York. Øen, along with all other NSC country directors, enjoys diplomatic status under the heading of "other delegates" as defined in the Norwegian Act on Diplomatic Services and by agreement between the NSC and the Norwegian Ministry of Foreign Affairs. *Id.* Her role is to promote Norwegian seafood in the United States and to report to Norway on observed trends and developments relating to United States seafood consumption, as a byproduct of which she frequently attends trade shows and other events within the United States that tout the benefits of Norwegian seafood. *Id.* For example, NSC arranged a webcast to be held at the time when the Seafood Expo North America would be held and one of the featured speakers was the Norwegian Minister of Fisheries); additionally, the Norwegian government is also sponsoring a sailing ship circumnavigating the

globe in connection with the United Nations, and the NSC is working with the Consulate in New York and the Norwegian Embassy to plan events in connection with the ship's arrival in New York. *Id*.

Plaintiffs served a subpoena (the "Subpoena") upon NSC at its Boston office seeking documents and communications related to pricing and marketing salmon in the United States and Europe, including databases used by NSC to track and analyze the prices, volumes, consumption, and supply and demand for salmon in the United States and Europe. ECF No. 3-5 at 12-14. The majority of these documents are not exchanged between NSC's headquarters in Norway and the United States office in the ordinary course of business, and Øen does not have access to a number of them. ECF No. 3. NSC initially filed a motion to quash the subpoena in the *Farm Raised Salmon* litigation, which was dismissed for lack of jurisdiction. NSC refiled the instant Motion to Quash in the District of Massachusetts; Plaintiffs, in their Response in Opposition to the Motion, requested the Motion be either denied or transferred to the Southern District of Florida under Federal Rule of Civil Procedure 45(f), and upon NSC's consent, the Motion was transferred to the Southern District of Florida. ECF No. 15.

## II.    ANALYSIS

NSC offers the Court three separate bases upon which it should quash the subpoena. It first avers that it is entitled to sovereign immunity but argues that even should the Court find sovereign immunity does not apply, NSC lacks sufficient contacts with the United States to satisfy Due Process. As a last point, NSC avers that, even if the Court finds personal jurisdiction established over NSC, principles of international comity compel the Court to quash the subpoena in favor of following the discovery procedures set forth by the Hague Convention.

### a.   Whether the Norwegian Seafood Council is Entitled to Sovereign Immunity

NSC first urges the Court to find that, as an instrumentality of Norway, it is "immune from the jurisdiction of the courts of the United States" as established by the Foreign Sovereign Immunities Act ("FSIA"), which confers sovereign immunity unless one of the FSIA's exceptions applies.  *See* 28 U.S.C. § 1604; *see also Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992) (explaining that immunity under the FSIA deprives the court of both personal and subject matter jurisdiction).   The first question before the Court is therefore whether NSC is an "instrumentality" as defined by the FSIA; if it is, the Plaintiffs bear the burden to show that one of the FSIA's exceptions applies—here, the commercial activity exception. *Sequeira v. Republic of Nicaragua*, 815 F. App'x 345, 348–49 (11th Cir. 2020) (noting the court may determine whether a plaintiff satisfies his burden by analyzing the allegations in the complaint and any undisputed facts submitted by the parties) (citation omitted).  Should the Plaintiffs satisfy this burden, it shifts back to NSC to demonstrate by a preponderance of the evidence that the exception cited by the Plaintiffs does not apply.  *Id.*

#### i.   Whether Norwegian Seafood Council is an Organ of the Norwegian Government

The FSIA defines an instrumentality as the following:

> a separate legal person, corporate or otherwise . . . which is an organ of a foreign state . . . or a majority of whose shares or other ownership interest is owned by a foreign state . . . and which is neither a citizen of the United States . . . nor created under the laws of any third country.

28 U.S.C. § 1603(b).  Courts consider a series of factors in contemplating whether an entity is an "organ" of the foreign state, including but not limited to the following:  whether the foreign state created the entity for a national purpose; whether it supervises the entity; whether it requires the entity to hire public employees and pays their salaries; how the entity is treated under foreign state

law; and whether the entity enjoys some exclusive right in the foreign state. *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*, 476 F.3d 140, 143 (2d Cir. 2007) (citation omitted).[3]

NSC argues that it indeed an organ of Norway, proffering that it was created by statute in 1991 as the Export Council for Fish and that since its incorporation as a limited liability company in 2005, it has been 100 percent owned by the Norwegian Ministry of Trade, Industry and Fisheries. ECF No. 2 at 10. NSC adds that as set forth in the Norwegian Act of Regulations of Exports of Fish and Fishery Products and the Directives on the Regulation of Fish and Fishery Products Export, NSC's mission is to promote Norwegian seafood both in the EU and abroad, and its duties include advising the Norwegian government on export-related issues. *Id.* at 11. One additional responsibility NSC holds is to act as the approval authority for all Norwegian seafood exporters who are statutorily required to register with the government. *Id.* at 12.

The Norwegian Ministry of Trade, Industry and Fisheries directly supervises NSC as its single shareholder, appointing all but three directors to its Board of Directors and issues directives for NSC to execute. *Id.* at 11. NSC proffers that it is subject to requirements akin to other Norwegian agencies; for example, the Office of the Auditor General of Norway monitors both NSC's compliance with Norwegian law and the directives given to it by the Norwegian government, and as part of this oversight, NSC provides minutes from each board meeting to the Auditor General. *Id.* NSC is also subject to Norwegian procurement regulations. *Id.* at 12. As a final note, NSC is funded exclusively through a duty tax levied against seafood exports by the Norwegian government. *Id.*

I find that NSC is indeed an organ and instrumentality of the Norwegian government. It was created by the government for a national purpose—to promote Norwegian seafood and act as

---

[3] *Peninsula Asset Mgmt. (Cayman) Ltd.* also acknowledges that the FSIA applies in situations where a foreign sovereign has been served with a third-party subpoena.

the gatekeeper for would be exporters.  Even after NSC's incorporation in 2005, it still largely functions in a manner analogous to a government agency, in that it is subject to the regulation of the Norwegian government, it takes action in accordance with mandates handed down by the Norwegian government, and it derives its income solely through the tax dollars of exporters.  The fact that the Ministry of Trade, Industry and Fisheries is the sole shareholder, bolsters NSC's status as an instrumentality of the state even further, as it makes clear that the Ministry exercises significant control over NSC.  Plaintiffs concede that NSC is an organ of the Norwegian government and thus the FSIA applies but that NSC is not entitled to sovereign immunity for the reasons discussed below.

  ii. <u>Commercial Activity Exception</u>

    *1. Whether NSC was Engaged in Commercial Activity*

  Having established a *prima facie* case that NSC is a foreign sovereign entitled to the protection of the FSIA, the burden then shifts to Plaintiffs to offer evidence that NSC lacks immunity by virtue of one of the FSIA's exceptions.  *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 241–42 (2d Cir. 2002).  Plaintiffs here urge the Court to invoke the commercial activity exception, which requires a showing of the following:

> the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2); *see also* 28 U.S.C. § 1603(d) (defining commercial activity as either a "regular course of commercial conduct or a particular commercial transaction or act").  As articulated by the Supreme Court in *Weltover, Inc*., a foreign sovereign's actions fall within the ambit of "commercial" as contemplated by the FSIA when they behave "in the manner of a private

player" within the market, rather than as a regulator of it.  504 U.S. at 614; *see also Merlini v. Canada*, 926 F.3d 21, 32 (1st Cir. 2019) (stating that irrespective of the motive behind the actions of the foreign sovereign, they are deemed commercial if they were the type of actions through which a "private party engages in trade and traffic or commerce" (citation omitted)), *cert. denied*, 140 S. Ct. 2804 (2020).

NSC argues that it decidedly does not engage in commercial activity, drawing a comparison to *Kato v. Ishiara*, 360 F.3d 106 (2d Cir. 2004), in which the court found the commercial activity exception did not apply in a sexual harassment suit brought by an employee against the Tokyo Metropolitan Government's ("TMG") New York office.  ECF No. 2 at 13.  The TMG promoted Japanese companies in the United States in a variety of ways, including promoting specific products by manning booths at trade shows and creating marketing reports that might be useful to Japanese companies.  *Kato*, 360 F.3d at 109.   The TMG employee, who was a civil servant under Japanese law, claimed that she was sexually harassed and was entitled to sue TMG in the United States because her duties were "commercial" in a manner invoking the commercial activity exception of the FSIA.  *Id.*

In analyzing whether TMG's activities in New York were akin to those of a private party engaging in commerce, the Second Circuit found that they were not; while a private Japanese business *may* take some of these actions on its own behalf (attending trade shows as an example), a business would not endeavor to promote *other* Japanese businesses or Japanese business interests in general.  *Id.* at 112.  The court ultimately concluded that the "promotion abroad of the commerce of domestic firms is a basic—even quintessential—governmental function."  *Id*.  NSC argues that it analogously promotes Norwegian fish and fish products from various Norwegian firms around the world as part of a "quintessential government function." ECF No. 2 at 14.

Plaintiffs argue that the commercial activity exception applies because in promoting Norwegian seafood, they allege NSC acted no differently than one of the Defendant producers in *Farm-Raised Salmon* might.  Plaintiffs claim this is determinative under *Pablo Star Limited v. Welsh Government*, 961 F.3d 555 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 1069 (2021), which Plaintiffs argue narrowed the Second Circuit's holding in *Kato* and undermines NSC's reliance on it.  ECF No. 11 at 13.  The Second Circuit in *Pablo Star* contemplated whether the Welsh Government was engaging in commercial activity when it used two photos—allegedly in violation of copyrights held by the plaintiff—to promote tourism to Wales through certain Welsh-themed walking tours in New York City.  *Pablo Star Ltd*, 961 F.3d at 558.  The court observed that the Welsh Government was acting as a private entity might in using the photos to promote tourism.  *Id.* at 563 (citing, as an example, how an airline might promote cultural or entertainment opportunities at one of its destinations).  Even though the Welsh government might not have been motivated by profit in the same way an airline might, the purpose is "irrelevant to the determination of whether the activity is 'commercial' for purposes of the FSIA." *Id.*

In finding that the Welsh government indeed engaged in commercial activity and was thus not entitled to sovereign immunity on the copyright claims, the Second Circuit in *Pablo Star* noted two key distinctions from the facts in *Kato*:  first, unlike the TMG in *Kato*, the Welch government engaged in promotional activities on *its own behalf* rather than on behalf of third parties; and second, the TMG's promotion of Japanese business interest in the United States was not the conduct predicating the employee's claims of sexual harassment.   *Id*. at 564.   The Welsh government's conduct forming the basis of the copyright claims was comprised of actions that "could have been done by a private party for commercial gain." *Id*. (noting that there was nothing "quintessentially governmental about using a photograph in a printed brochure or on a web page

or distributing the photograph to newspaper outlets to advertise or promote travel and tourism to a particular location").

Plaintiffs argue that when divested of the potential motivating purpose behind them, the actions taken by NSC in the United States are no different from those taken by the defendant producers in *Farm-Raised Salmon*.  ECF No. 11 at 15.  These producers also attended trade shows and promoted their own salmon through, for example, Presidential dinners, publicization through newspaper articles or reviews, partnerships with the James Beard Foundation and the Women Chefs and Restauranteurs organization.  Plaintiffs claim these actions are "simply not that different" from those of NSC and argue NSC has conceded as much by acknowledging that it engages in close cooperation on marketing efforts with producers.  *Id.*

While *Pablo Star* emphasized that the commercial activity analysis under the FSIA requires the court to focus on the actions themselves rather than the motivation behind them, it did not render the context irrelevant.  While producers and the NSC may both attend trade shows and the like, there is a crucial distinction to be made here—the producers were, by Plaintiffs' own admission, acting *on their own behalf*.  NSC, in contrast, was not promoting itself, but rather was promoting various exporters of Norwegian seafood.  This differs from *Pablo Star*, in which the Welsh government distinguished the facts from *Kato* in large part because the Welsh government was singularly promoting its own interests.  This is a separate inquiry from what NSC's motivations were; NSC may have been motivated to uphold the public image of Norwegian seafood, and *in its actions* NSC promoted Norwegian seafood.  As observed by the court in *Kato*, a commercial business would not ordinarily be in the habit of promoting other businesses or the country's business interests generally, as NSC did.

Accordingly, I find that NSC was engaged in a quintessential government function by

promoting Norwegian seafood and recommend this as a basis for quashing the subpoena.

2. *Whether the NSC's Conduct was Based Upon the Action*

As a secondary reason to find that the commercial activity exception does not apply, NSC argues that there is an insufficient nexus between the information sought in the Subpoena and NSC's minimal activity in the United States as required to trigger the commercial activity exception under the FSIA. *Id*. at 15. NSC argues this requirement arises from the statutory language, citing *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015), which held that the prefatory language "based upon" in the statutory exception requires that the "particular conduct on which the action is based" constitutes the "gravamen" of the suit. ECF No. 2 at 13 n.27; *see also Sequeira*, 815 F. App'x at 348-49 (same).

In *OBB Personenverkehr AG*, the plaintiff, a United States resident, brought suit against an Austrian-owned railway for personal injuries suffered while trying to board one of its trains in Austria. 577 U.S. at 29. The plaintiff argued that the commercial exception applied because the suit was "based upon" the sale of the railway pass to her in the United States, but the Court found this was not so, concluding that the action was instead "based upon" the railway's conduct in Austria, where she was injured. *Id*. Before reaching the Supreme Court on appeal, the Ninth Circuit found that "the only relevant commercial activity within the United States" was the plaintiff's purchase of the ticket and that her claims "based upon the sale of the [railway] pass" were sufficient to trigger the exception because it formed an element of each of her claims. *Id.* at 32 (noting that, for example, the plaintiff was required to show the defendant railway owed her a duty of care as a passenger and that duty arose from the sale of the railway pass). The Supreme Court disagreed, finding the Ninth Circuit's approach incongruous with prior precedent; the salient fact was that the conduct constituting the gravamen of the plaintiff's suit clearly occurred in

Austria, and there was "nothing wrongful" about the commercial sale of the railway pass in the United States when considered in isolation. *Id*. at 35. No matter how the plaintiff framed her suit, the incident in Austria was the one at its core, and to hold differently would permit artful plaintiffs to give broad jurisdictional significance to a "feint of language" that would "effectively thwart the Act's manifest purpose." *Id.* at 36 (citation omitted).

The Subpoena, argues NSC, seeks economic information on salmon supply, demand, and pricing in Europe, information from Norwegian databases, and information related to Russian trade actions. ECF No. 2 at 15. But NSC's activity in the United States is limited to "keeping up with trends" that might impact Norwegian seafood exports and attending the occasional trade show. *Id*. NSC reiterates that it has a *single* employee in the United States who works with the Norwegian Embassy and Consulate. *Id*. NSC asserts that none of these categories of documents bear any relation to NSC's actions in the United States and thus the commercial activity exception is not triggered. *Id*.

Plaintiffs respond to NSC's nexus argument by averring that NSC's "joint efforts [with] producers like Defendants over many years to expand the market for salmon in the United States satisfies the requisite 'substantial contact' to establish jurisdiction in this nation," ECF No. 11 at 16, but this misunderstands NSC's argument. Plaintiffs are correct that the commercial activity exception of the FSIA imposes an additional requirement that the commercial activity carried on by the foreign state or agency or instrumentality thereof have "substantial contact" with the United States. 28 U.S.C. § 1603(e); *see also Pablo Star Ltd*., 961 F.3d at 565 (noting that "substantial contact" under the FSIA is poorly defined by has been interpreted to require something more than the minimum contacts analysis for Due Process and finding that the Welsh government's marketing efforts in New York were sufficient to constitute "substantial contact" with the United

12

States).  NSC does not, however, travel on a theory that it lacks substantial contact with the United States with regard to its sovereign immunity defense; rather, it argues that the information sought in the subpoena is not "based upon" its activity in the United States.  *See OBB Personenverkehr AG*, 577 U.S. at 29.  Put differently, NSC argues about the nexus between its United States-based activities and the discovery Plaintiffs seek while Plaintiffs analyze the nexus between NSC's United States-based activities and the United States itself.

The nexus inquiry played a significant role in the court's analysis in *Pablo Star*.  The Second Circuit found it significant that the Welsh government's commercial activity was directly linked to the alleged conduct giving rise to the dispute; the Welsh government was accused of copyright infringement in its tourism advertisements and those tourism advertisements were the primary basis for the court's finding that the government was engaging in commercial activity.  As noted above, in distinguishing *Kato*, the court in *Pablo Star* observed that, unlike the Welsh government's actions, the TMG's promotion of Japanese business interests in the United States was unrelated the conduct giving rise to the plaintiff's sexual harassment claims.

Consequently, while relevant to both the substantial contact and personal jurisdiction analysis, Plaintiffs' argument here does not squarely address the point NSC places at issue—the Subpoena requests documents that NSC argues are wholly unrelated to the NSC's activities in the United States, and Plaintiffs offer no facts refuting this claim.  NSC argues adamantly that the relevant inquiry here is into the nexus between its activities in the United States and the information sought *in the subpoena* rather than the as between its activities and *Farm-Raised Salmon*, claiming that for purposes of the FSIA analysis "the action" would here refer to the subpoena rather than the underlying litigation, to which NSC is not a party.  The Court need not, however, come to a

finding on this point, as Plaintiffs do not offer facts or evidence sufficient to find any nexus between NSC's activity in the United States and the conduct alleged in *Farm-Raised Salmon*.

Plaintiffs alternatively argue that NSC's conduct *outside* the United States should fall within the last provision of the commercial activity exception, which refers to acts outside of the United States "in connection with a commercial activity of the foreign state elsewhere" that "cause[d] a direct effect in the United States." ECF No. 11 at 16 (citing 28 U.S.C. § 1605(a)(2)). Plaintiffs do not explicitly state that the direct effect in the United States they reference here would necessarily be the price-fixing conduct alleged in *Farm-Raised Salmon*, but the Court will assume for the sake of argument that this is the intended theory. In support, Plaintiffs proffer the allegations in the complaint that NSC "enabled Defendants to meet and collude" and gave them access to information about specific companies providing the Defendants with "sensitive market insight," all in the manner of a business. ECF No. 11 at 16.

While the Court may consider allegations in the complaint in determining whether one of the FSIA's sovereign immunity exceptions applies, *see Sequeira*, 815 F. App'x at 349, the cited allegations are too conclusory to support a finding that NSC's actions abroad constituted commercial activity. They do not explain *how* NSC took these actions, nor why they resemble actions taken by a business in the marketplace.

Accordingly, the undersigned recommends that the Subpoena be quashed because there is no demonstrable nexus between the commercial activity identified and either the documents sought in the Subpoena or to the claims in *Farm-Raised Salmon*, no matter which is used as the yardstick. Plaintiffs have thus not carried their burden to show that the action here is based upon the commercial activity.

### b. Whether this Court has Personal Jurisdiction Over the Norwegian Seafood Council

NSC next argues that even absent the protections of sovereign immunity, the general principles of Due Process justify quashing the Subpoena. ECF No. 2 at 15.

Absent personal jurisdiction, a court is powerless to take further action. *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 n.6 (11th Cir. 1999). It is well-settled that a court must therefore have personal jurisdiction over a nonparty in order to compel their compliance with a discovery request made under Rule 45. *Heissenberg v. Doe*, No. 21-80716-CIV, 2021 WL 2621100, at *2 (S.D. Fla. June 24, 2021) (Reinhart, J.). Once the plaintiff seeking to establish personal jurisdiction over a nonresident defendant makes out a *prima facie* case, the burden shifts to the opponent to challenge the plaintiff's allegations through affidavits or other pleadings. *Id.* (citation omitted); *see also U.S. S.E.C. v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997) (noting that in this analysis the court must accept the facts alleged in the complaint as true to the extent they are not contradicted by the opponent's affidavits; where the two conflict, reasonable inferences must be construed in favor of the plaintiff).

Two types of personal jurisdiction exist: general and specific. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). A court with general jurisdiction over a foreign corporation is free to hear and all claims against them and requires the corporation to maintain affiliations with the forum state that are so continuous and systematic as to render them "essentially at home." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In the absence of exceptional circumstances, general personal jurisdiction over a corporation is limited to the state in which it is incorporated and where its principal place of business sits. *Daimler AG v. Bauman*, 571 U.S. 117, 138-39 & n.19 (2014). NSC is headquartered and incorporated abroad, and Plaintiffs offer no facts or argument that NSC is "essentially at home" anywhere in the United States.

Where a plaintiff cannot establish general personal jurisdiction, as here, the court next considers whether specific personal jurisdiction exists. Under Eleventh Circuit law, courts apply a three-part test analyzing whether the plaintiffs met the burden of demonstrating the following: (1) whether the claims arise from or relate to at least one of the defendant's contacts with the forum state; (2) whether the defendant purposefully availed itself of the privilege of conducting activities in the forum. *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1313 (11th Cir. 2018). Only if the first two prongs are satisfied will the court then ask whether the defendant makes a compelling case that the exercise of jurisdiction would "violate tradition notions of fair play and substantial justice." *Id*.

Typically, the forum state is the state in which the court sits, but where federal personal jurisdiction is invoked based on a federal statute that provides for nation or worldwide service, "the relevant inquiry is whether the respondent has had sufficient minimum contacts with the United States." *Carrillo*, 115 F.3d at 1543. As explained by the Eleventh Circuit in *Carrillo*, in federal question cases the constitutional limits of the court's personal jurisdiction are bound by the Due Process Clause of the Fifth Amendment rather than the Fourteenth, negating the federalism concerns present in the jurisdictional analysis for diversity cases and thereby geographically expanding the court's authority to exert personal jurisdiction. *Id.* (stating that Federal Rule of Civil Procedure 4(k)(2) comports with the national contacts approach). Plaintiffs here argue jurisdiction exists under the FSIA, a federal statute, which thus shifts the Court's inquiry to NSC's contacts with the United States generally.

Reiterating their argument that NSC's actions satisfy the "substantial contact" requirement of § 1603(e), Plaintiffs claim that "*ipso facto*" personal jurisdiction exists. This is incorrect. While the court in *Pablo Star Ltd*. observed that Congress intended the substantial contact standard to be

16

more stringent than the Due Process analysis, 961 F.3d at 565, that fact does not doctrinally justify folding the two standards into a single analysis.  Under the specific personal jurisdiction analysis, a litigant seeking to establish personal jurisdiction must additionally demonstrate that the underlying claims can be fairly said to arise from or relate to a defendant's contact with the forum. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct*., 141 S. Ct. 1017, 1025, (2021) (stating that this requirement is imposed in specific jurisdiction cases expressly because the defendant is not otherwise "at home" in the forum).  The same is not true of the substantial contact under the FSIA, which considers only the relationship between the commercial activity and the forum.

Arguing that the facts here support the Court's exercise of personal jurisdiction over NSC regardless of the "substantial contact" question, Plaintiffs claim that NSC has purposefully availed itself of the United States for many years through the use and maintenance of its Boston office. ECF No. 11 at 17.  Plaintiffs also assert that NSC regularly engages in promotional activity through the marketing of Norwegian salmon, noting that NSC's sole Boston-based employee is charged with promoting Norwegian seafood in the United States and then reporting trends back to Norway, all of which is "inextricably linked" to the conduct alleged in *Farm-Raised Salmon*.  *Id*.  Plaintiffs further claim that NSC is "partially responsible" for growing the United States market, which in turn permitted Defendants to expand salmon sales in that market and charge "collusively high prices."  *Id*.  And finally, Plaintiffs claim that NSC permits its members to share confidential pricing information, arguing, as above, that this enabled the "farmed salmon cartel to police its participants."  *Id*.

As observed by Judge Reinhart in *Heissenberg*, in the context of a third-party challenging the jurisdictional basis for a subpoena, it remains an open question as to whether the third party's contacts with the forum should be measured in relation to the claims giving rise to the litigation *or*

17

in relation to the "matters within the scope of the subpoena." 2021 WL 2621100, at *3 (noting that some courts consider the proper comparator to be the subpoenaed materials (citing *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 141-42 (2d Cir. 2014); *In re 3M Combat Arms Earplug Products Liability Litigation*, No. 3:19-MD-2885, 2020 WL 5578428, at *7 (N.D. Fla. Feb. 18, 2020))). Also like the court in *Heissenberg*, the Court need not resolve that issue because specific personal jurisdiction does not exist under either approach—Plaintiffs' allegations regarding NSC's conduct largely bear only an indirect relationship to its presence and activities in the United States.

As per Plaintiffs' allegations here, the only direct contact NSC has with the United States is through its Boston office and the promotion of Norwegian Seafood *in* the United States. Even if this constituted purposeful availment, Plaintiffs do not allege any facts that would link NSC's efforts to promote Norwegian seafood in the United States to the documents Plaintiffs seek in the Subpoena. Øen explains, without contradiction, that the documents are unrelated to her role, as the sole United States-based employee; the documents are hosted by servers physically located in Norway; the overwhelming majority of those documents are not exchanged between the Norwegian and the American offices in the ordinary course of business; and at least some portion of the documents are inaccessible to her. ECF No. 30.

Nor do Plaintiffs evidence an affiliation between NSC's promotion of Norwegian seafood in the United States and the price-fixing conduct alleged against the Defendant producers in *Farm-Raised Salmon*. Plaintiffs allege in the *Farm-Raised Salmon* complaint that the Defendant seafood producers engaged in a coordinated strategy to fix the price of Norwegian Salmon through transactions reported to the NASDAQ Salmon Index, a reference point used to set salmon prices globally, and their litigation travels on the theory that this market manipulation adversely affected direct purchasers located in the United States. *Farm-Raised Salmon*, ECF No. 168. Plaintiffs

contend that the Boston-based activities of the NSC are inextricably linked to this litigation but do not advance facts or evidence to support this contention. Specifically, while Plaintiffs allege upstream connections between NSC and the Defendants resulted in or contributed to the harm to salmon purchasers alleged in *Farm-Raised Salmon*, claiming that NSC enabled the Defendants to collude and set salmon prices in the market and contributed in part to growth in the market that Defendants allegedly manipulated, they do not tie this back to NSC's conduct *in* the United States.

NSC's database containing what Plaintiffs contend is confidential market information that was shared with NSC members is located and maintained in Norway, and Plaintiffs do not argue to the contrary. The same is true for the claims around market growth—Plaintiffs argue that NSC promoted Norwegian seafood in the United States, but evidence of promotion does not, without more, demonstrate that NSC grew the global market. Connections this tenuous have long been eschewed as a basis for personal jurisdiction. *See, e.g.*, *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980). When there is no such affiliation, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cty.*, 137 S. Ct. 1773, 1781 (2017). Accordingly, Plaintiffs have not met their burden to establish that the Court has personal jurisdiction over NSC and I recommend this as an additional basis for quashing the Subpoena.

### c. Hague Convention Discovery Procedures

As a final basis for quashing the Subpoena, NSC claims that Plaintiffs' targeting of NSC's small office in the United States is an attempt to sidestep the international discovery procedures set out in the Hague Convention on Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention"). The Hague Convention states in relevant part that in "civil or commercial matters a judicial authority of a Contracting State may, in accordance with the provisions of the law of that State, request the competent authority of another Contracting State, by means of a

19

Letter of Request, to obtain evidence, or to perform some other judicial act."  Mar. 18, 1970, 23 U.S.T. 2555.

The undersigned has already recommended that the Subpoena be quashed on two bases: because NSC is protected by sovereign immunity and because the Court lacks personal jurisdiction.  Even if personal jurisdiction was established and if the commercial activity exception to NSC's sovereign immunity was triggered, principles of international comity would separately justify quashing the Subpoena in accordance with *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522 (1987).  Since *Aérospatiale*, courts weighing international comity decisions consider the following:

> (1) '[t]he importance to the litigation of the documents or other information requested'; (2) '[t]he degree of specificity in the request'; (3) '[w]hether the information originated in the United States'; (4) '[t]he availability of alternative means of securing the information'; and (5) '[t]he extent to which noncompliance with the request would undermine the important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.'

*In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19-MD-2885, 2020 WL 5578428, at *4 (N.D. Fla. Feb. 18, 2020) (quoting *Aérospatiale*, 482 U.S. at 544 n.28).

Plaintiffs cite to the Court's application of the *Aérospatiale* factors in the Discovery Order in *Farm-Raised Salmon* in which this Court found that production was warranted, arguing that analysis compels the same result here.  ECF No. 11 at 19 (citing *Farm-Raised Salmon*, ECF No. 233)).  Ultimately, argue Plaintiffs, obtaining the documents under Rule 45 is "preferable and more efficient" than the procedures under the Hague Convention, and the United States' interest in enforcing its own antitrust laws should trump the interests of Norway.  ECF No. 11 at 20.  NSC avers in response that, unlike the Defendants in *Farm-Raised Salmon*, it is not a party to the litigation, it is an entity of the Norwegian Government, and it has not already produced the

documents sought in another jurisdiction. ECF No. 24 at 5. NSC further argues that the Subpoena seeks broad categories of documents not exchanged between NSC's United States office and its Norway headquarters in the ordinary course of business, unlike the "discrete set" of previously produced documents at issue in the *Farm-Raised Salmon* Discovery Order. NSC additionally proffers that the documents sought by Plaintiffs could be obtained from the Defendants themselves. ECF No. 2 at 21. As a final argument, NSC avers that compliance with this request would undermine Norwegian government interests as it could provide Plaintiffs with access to confidential information related to Norway's foreign and domestic policies. *Id*.

NSC is a foreign entity and is not subject to the jurisdiction of this Court, which renders this issue moot. But even were that not the case, I would recommend that the principles of international comity justify quashing the Subpoena and requiring the Plaintiffs to follow the procedures set forth by the Hague Convention. Plaintiffs' argument that the process is cumbersome is unavailing, as is the uncomfortable suggestion that the United States should unilaterally decide its interests supersede those of the Norwegian government. Plaintiffs seek broad swaths of information that did not originate in the United States and can be achieved by other means. These facts, combined with Norway's interest in protecting confidential information related to its foreign and domestic policies, justify quashing the Subpoena.

## III.    CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends that non-party Norwegian Seafood Council's Motion to Quash, ECF No. 1, be **GRANTED**.

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Cecilia M. Altonaga, Chief Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation.

Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."   11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

**RESPECTFULLY SUBMITTED** in Chambers, in Miami, Florida this 20th day of August, 2021.

_____
LAUREN FLEISCHER LOUIS
UNITED STATES MAGISTRATE JUDGE

cc:  All Counsel of Record

22